IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
July 13, 2004 Session

## ANTHONY D. CUTTLE v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Shelby County**
**No. P-20307     J.C. McLin, Judge**

---

**No. W2003-00684-CCA-R3-PC  - Filed September 28, 2004**

---

The petitioner appeals the denial of his petition for post-conviction relief, arguing that the post-conviction court erred in finding he received effective assistance of counsel and in denying his request to represent himself at the post-conviction proceeding. Following our review, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which NORMA MCGEE OGLE, J., joined. JOHN EVERETT WILLIAMS, J., filed a concurring opinion.

Marty B. McAfee, Memphis, Tennessee, for the appellant, Anthony D. Cuttle.

Paul G. Summers, Attorney General and Reporter; Jennifer L. Bledsoe, Assistant Attorney General; William L. Gibbons, District Attorney General; and Vanessa King, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### FACTS AND PROCEDURAL HISTORY

In August 1995, the petitioner, Anthony D. Cuttle, was tried in the Shelby County Criminal Court on two counts of attempted especially aggravated kidnapping. The jury acquitted him of one count but convicted him of the other, for which he received a twenty-year sentence in the Department of Correction as a Range II offender. See State v. Anthony D. Cuttle, No. 02C01-9605-CR-00153, 1997 WL 730255, at *1 (Tenn. Crim. App. Nov. 25, 1997), perm. to appeal denied (Tenn. July 13, 1998). The petitioner's conviction and sentence were subsequently affirmed by this court, and our supreme court denied his application for permission to appeal. Id.

Our direct appeal opinion provides the following account of the crime:

On the night of April 5, 1994, the victim, Norma Voyles was sitting in her car outside her home when the [petitioner] approached her vehicle, stuck a gun to her head, and ordered her to open the door. When the [petitioner] insisted on taking the driver's seat, the victim struggled and managed to escape to the driveway where the [petitioner] held his cocked gun to her head and threatened to kill her. The struggle lasted for around ten minutes before the victim's son heard the screams and emerged from their residence. At that point, the [petitioner] pushed the victim to the ground and ran away.

The victim called police who arrived some five minutes later. When the investigating officers received word that a man fitting the assailant's description had been taken into custody, the victim was asked to make an identification. Initially uncertain, the victim made a positive identification after the [petitioner] put on the hood of his sweatshirt. Later, the victim was able to identify the [petitioner] two more times, once in a lineup at the police station and again at the preliminary hearing.

On the same night, only a few minutes later, Debra Hanna was attacked by a man she identified as the [petitioner]. She stated that as she was unlocking her residence door, the [petitioner] approached her holding a gun. Ms. Hanna was able to get inside, lock the door, and call police. Within ten minutes, police arrived and reported that they had taken a man into custody only a few houses away, who fit her description of the attacker. When escorted by the police to where the [petitioner] was held, Ms. Hanna identified the [petitioner] as her assailant.

. . . . When apprehended, the [petitioner] was carrying a butcher knife but had no gun.

At trial, the [petitioner] denied any involvement in either attack. He claimed that he and a friend had been visiting with his cousin. He asserted that he had decided to visit his ex-girlfriend, walked over to her apartment, and, unable to locate her, was returning to his cousin's residence when stopped by police.

Antoine Thompson, a witness for the defense, claimed that he and the [petitioner] were at a mutual friend's residence watching television until sometime between 10:30 and 11:30 p.m. Thompson recalled that when he went to bed, the [petitioner] was still at the residence.

Id.

       The post-conviction proceedings in this case are somewhat complex. Although not included in the record, the petitioner apparently filed an original *pro se* petition for post-conviction relief in August 1998, which was summarily dismissed after the appointment of counsel. On February 15, 2001, the petitioner filed a *pro se* motion to reopen his post-conviction petition, which was, apparently, granted by the post-conviction court. Counsel was subsequently appointed and an amended petition for post-conviction relief, incorporating the *pro se* petition and alleging ineffective assistance of trial counsel, was filed on November 6, 2001. The amended petition was followed by a supplemental amended petition on June 14, 2002, and a second supplemental amended petition on October 29, 2002, which, together, alleged counsel was ineffective, *inter alia,* for failing to adequately investigate and prepare for the case, failing to effectively cross-examine witnesses, and refusing to assist the petitioner with his trial testimony.

       The post-conviction court granted the petitioner's motion to proceed *pro se* on August 15, 2002, but reversed itself approximately one week later, reappointing counsel on August 26. An evidentiary hearing, at which the post-conviction court allowed both counsel and the petitioner to present separate proof and arguments, was held on September 26, 2002, October 29, 2002, and February 7, 2003. On October 29, 2002, the petitioner filed a *pro se* amended petition for post-conviction relief.

       On March 7, 2003, the post-conviction court entered a detailed written order denying the petition for post-conviction relief. Different counsel was appointed to represent the petitioner on appeal, and a notice of appeal was filed that same day. Nonetheless, the petitioner filed a *pro se* notice of appeal on March 13, 2003, a *pro se* brief on September 4, 2003, and a *pro se* "Motion to Consider Appellant's Pro Se Brief as the Initial Brief" on October 21, 2003. On October 31, 2003, this court entered an order denying the petitioner's motion to have his *pro se* brief considered and ordering that all future pleadings be filed by the petitioner's appellate counsel. On November 6, 2003, appellate counsel filed his brief with this court. On April 3, 2003, the petitioner filed a *pro se* "Motion to Dismiss Court-Appointed Appellate Counsel," alleging ineffective assistance of appellate counsel and requesting that he be allowed to proceed *pro se* with his appeal. This court denied his motion by order entered on April 22, 2003.

       In his *pro se* petitions and at the evidentiary hearing, the petitioner contended he was entitled to post-conviction relief on four grounds: (1) he was unlawfully arrested; (2) illegal evidence was introduced at his trial; (3) the prosecutor, his trial counsel, and the trial court conspired to suppress exculpatory evidence; and (4) he received ineffective assistance of trial counsel. His claim of ineffective assistance was based on a number of allegations, including that counsel conspired with the trial court and the prosecutor to suppress a police dispatch transcript, which would have shown the discrepancies between the petitioner's appearance at the time of his arrest and the descriptions the victims provided to police of their attacker, as well as the time that elapsed between the victims' calls to police; counsel failed to call an alibi witness to testify at trial; counsel insisted on contacting that same alibi witness despite the petitioner's instructions to stop bothering her; counsel failed to

cross-examine the victims on alleged inconsistencies in their testimony; and counsel failed to subpoena and introduce a second police dispatch record, which would have revealed that the petitioner's arresting officer lied and framed the petitioner for the crime.

Trial counsel, who had thirty years experience in criminal defense at the time of the evidentiary hearing, testified he represented the petitioner in criminal court in his capacity as an assistant public defender. His preparation of the case included interviewing witnesses, researching the law, and reviewing the evidence. He was confident he received and reviewed a copy of the transcript of the preliminary hearing. Trial counsel believed one of the central issues in the case involving Ms. Hanna was that the petitioner was "misindicted," because the facts alleged did not fit a kidnapping. He argued the issue to the jury and believed it formed the basis for the petitioner's acquittal on that count.

Trial counsel testified the petitioner provided him with the names of two potential alibi witnesses: Antoine Thompson, who testified at trial but provided less than an airtight alibi, and Jeannine Conley, whom the petitioner claimed would be able to place him elsewhere at the time of the attacks. Trial counsel said Conley informed him she had been diagnosed as manic depressive, was on medication for depression and hypertension, and could not recall when or where she had seen the petitioner. Therefore, he concluded her testimony would not be helpful.

Trial counsel testified he advised the petitioner he thought it would be devastating for the petitioner to testify because the State would be able to introduce his prior conviction for murder as well as possibly his prior armed robbery conviction. The petitioner agreed and maintained throughout the trial that he did not wish to take the stand. However, after he had been voir dired about his decision not to testify and both the State and the defense had rested, he suddenly jumped to his feet and "exploded" with the announcement that he now wished to testify.

Trial counsel acknowledged he was probably upset with the petitioner and might have lost his temper. As for whether he was wrong in refusing to assist the petitioner's testimony, counsel testified that he thought asking questions would "compound the damage" and that he "may have made a mistake," but thought he would "make the same . . . decision again." Trial counsel conceded the petitioner's testimony probably would have been smoother had he directed it. He insisted, however, that his participation would not have been enough to "overcome the devastating things that occurred from [the petitioner's] testimony." Moreover, he would not have been able to control the petitioner's demeanor and cocky attitude. On cross-examination, trial counsel agreed the petitioner would not have been able to explain the facts underlying his prior convictions if counsel had directed his testimony by asking specific questions requiring responsive answers. Counsel testified he had gone over the events of the night in question with the petitioner, but had not prepared a list of questions because the petitioner had consistently expressed his intention of not testifying. In trial counsel's opinion, the petitioner's testimony resolved in favor of the State any doubt the jury may have had about his guilt.

Trial counsel acknowledged his file contained a copy of a police report showing that a latent fingerprint lifted from the victim's car did not match the petitioner. He could not recall if he cross-examined any police officers on that fact and did not think he called the fingerprint technician to testify. However, he did not believe the fingerprint evidence would have helped the petitioner's case. Trial counsel testified the petitioner wanted him to introduce a dispatch transcript at trial that he believed would prove he was not the perpetrator. In counsel's opinion, the evidence would have hurt, rather than helped, the petitioner's case, as he explained:

> A.    Well, I subpoenaed the records from the dispatcher. And as I recall there was about a twenty minute gap between the first call from Ms. Voyles, when Ms. Voyles called the police and made her complaint and when Ms. Hanna did it. It was about a twenty minute difference.
>
> I had my investigator go out and measure the distance in his car between the Creighton address where Ms. Hanna was and the Navaho address where Ms. Voyles was. And he reported back that it was about a mile and a half between the two spots. In my calculation, I mean, certainly a car could travel between those two spots in less than twenty minutes.
>
> Q.    Sure.
>
> A.    A man walking fast or jogging could probably do it. I didn't think that would help [the petitioner] to show that, to put that evidence on to show when those calls were made to the dispatcher. In fact, I thought it would show that he had every opportunity to be at both places that night because of the difference in the calls. If the calls had come in a minute a part [sic], I certainly would had done it. But there was a twenty -- I think as I remember right, a twenty minute differential.
>
> And as I should say, [the petitioner] wanted me to do it anyway and that's another decision I made on my own.
>
> Q.    Okay. It was not a twenty minute move but twenty-four minutes, something like that. Does that sound about right?
>
> A.    Yeah, that's the best I recollect.

Trial counsel acknowledged the dispatch transcript described Ms. Voyles's attacker as a black male in his late teens or early twenties, although the petitioner was thirty years old at the time of the crime. He could not recall if the clothing description contained in the report matched the petitioner's

clothing, but thought he recalled that Ms. Voyles, who was a "very good witness," described the perpetrator's clothing when she reported the crime to the police and that the petitioner was wearing similar clothing when arrested. In addition, he believed Ms. Voyles identified the petitioner as the perpetrator several times, including at the time of his arrest, from a later photographic lineup, and again at trial. According to trial counsel, Ms. Voyles's testimony formed the basis for the State's case.

During the petitioner's lengthy, rambling, and repetitive evidentiary hearing testimony, he asserted, *inter alia*, that Memphis Police Officer R. D. Harrell framed him for the crime; the other police officers who testified at trial committed perjury at Officer Harrell's behest; trial counsel, the prosecutor, and the trial court "covered up" the officer's actions and conspired to prevent exculpatory evidence, in the form of the dispatch transcript that recorded the time the victims reported the attacks and the perpetrator's description, from going to the jury; and the victims lied during their testimony. The petitioner also asserted that a second dispatch transcript, which the Memphis Police Department had since destroyed, would have proved he was arrested less than ten minutes after leaving his home.

The record reveals the alleged "exculpatory" dispatch transcript was, at the prosecutor's suggestion, marked as an exhibit at the trial for identification purposes after defense counsel sought and received the trial court's approval of his decision not to call the police dispatcher as a witness. A review of what transpired at trial is helpful in understanding the petitioner's claim with respect to this evidence:

> [TRIAL COUNSEL]: I don't know, we may have to excuse the jury to get this on the record, I don't know. But this man I have under subpoena, a dispatcher with the Memphis Police Department, who would testify when the calls, complaints came in. And of course they sit [sic] exactly with what the prosecution witnesses have testified to about when these things happened. And my client insist[s] that I call him as a witness and prove when complaints were made to police dispatcher. And I am not going to do it because it just wouldn't - - it would just help incriminate him. And I don't know if you want to, do you think we may have to put him on the record and air this out or not? Maybe we should. But I am not going to call the man just because he wants me to. I think it is not - -
>
> THE COURT: Do you think it will hurt his case?
>
> [TRIAL COUNSEL]: I think definitely it will hurt his case.
>
> THE COURT: We don't need to put it on the record, I mean, except what we are doing right now unless you want to. I certainly understand you know, you've been trying cases for twenty years, and you know when you ought to try to help somebody. Sometimes

people don't understand that you are trying to help them as best you can.

. . . .

THE COURT: Well, just for the basis of this record, the Court is going to rule that it is not necessary that you call the witness that you think would be detrimental to your client even though he thinks he should be called. I think you're looking out for his best interest. And you stated on the record that from what you tell me is true, and I'm sure you checked it, that it wouldn't do anything but put in the jury's mind a second time the times that these arrest [sic] occurred. It would certainly seem to this Court that it would be to the defendant, so.

[PROSECUTOR]: Along that line, your Honor, if it would help out, we can make an exhibit that will not go to the jury, obviously, of the record that I have which basically substantiate[s] what [trial counsel] is saying. The times falling exactly with ours, with what our witnesses have said.

THE COURT: Do you want to do that, [trial counsel]?

[TRIAL COUNSEL]: Yes, I would like to have that as an exhibit.

THE COURT: Let's make that part of the record and you can tell your client we'll do that and it can go up on appeal.

This dispatch transcript, which was introduced as an exhibit to the post-conviction hearing, describes Ms. Voyles's attacker as a male black in his teens or early twenties, wearing a dark gray hooded sweatshirt and blue jeans and armed with a pistol of unknown caliber, and Ms. Hanna's attacker as a male black wearing a dark-colored hooded sweatshirt and armed with a gun. Despite the post-conviction court's observation that the photograph taken of the petitioner at the time of his arrest shows he was dressed in similar clothing,[1] the petitioner repeatedly cited the differences between the descriptions of the perpetrator and his appearance as evidence that would have proved his innocence. He also cited the above-quoted interaction as evidence that the trial judge, the prosecutor, and trial counsel conspired to prevent the evidence from going to the jury.

---

[1]The photograph taken at the time of his arrest shows the petitioner dressed in a medium to dark blue hooded sweatshirt, dark gray jacket, and gray jeans.

-7-

The petitioner testified he and trial counsel discussed the events of April 5, 1994, and he informed counsel of how Officer Harrell had "set [him] up." When asked if trial counsel reviewed with him the type of questions he would be asked if he testified at trial, the petitioner replied:

> No. He told me, he basically told me in trial that if I testified in my own defense, that I was going to be found guilty because based on my past record. That's why when I did decide to take the stand and testify in my behalf and told the jury, I let them know that I did have a past record but don't hold it against me. That's the only reason why I was kind of reluctant about taking the stand in my own defense. When he told me that, my past record was going to get me convicted, I believed it. But when he refused to call that dispatcher on the stand to assist me, that's when I realized that I had to do something because he wasn't trying to do nothing for me.

The post-conviction court continued the evidentiary hearing from September 26, 2002, until October 29, 2002, to allow the petitioner time to subpoena witnesses he insisted were necessary to prove his allegations. At the October date, the assistant district attorney who prosecuted the case testified he provided open file discovery to trial counsel. He said he would have liked for the jury to have seen the dispatch transcript, but did not seek to have it introduced as a trial exhibit because he thought it was inadmissible hearsay. Antoine Thompson testified the petitioner's trial counsel never interviewed him prior to trial, but acknowledged he testified freely at trial and had no new information to add. Sergeant J. D. Simon and Lieutenant Dana Stine, two of the Memphis police officers involved in the petitioner's arrest, testified they turned in their paperwork in connection with the case and therefore no longer had any records of the petitioner's arrest.[2] The petitioner also sought to call the victim, Ms. Voyles, as a witness at the evidentiary hearing, stating that he needed her testimony to prove she falsely accused him of the crime, but the post-conviction court denied the request.

In its written findings of fact and conclusions of law, the post-conviction court found, *inter alia*, that counsel's determinations not to impeach the victims with their preliminary hearing testimony or to introduce the fingerprint or dispatch tape evidence amounted to tactical decisions based on an objectively reasonable trial strategy; that counsel was unreasonable for refusing to assist the petitioner's trial testimony; and that the petitioner had failed to show that counsel's deficiency in assisting his testimony prejudiced the outcome of his case. Accordingly, the court denied the petition for post-conviction relief.

## ANALYSIS

### I. Ineffective Assistance of Counsel

---

[2]Post-conviction counsel introduced as an exhibit to the evidentiary hearing a letter from Willaine Hampton, manager of "Memphis Police Communications," stating that the dispatch records for 1994 were no longer available.

The petitioner contends on appeal that trial counsel was ineffective for failing to assist him with his trial testimony, failing to adequately prepare for trial, and failing to effectively cross-examine witnesses. He further contends that the post-conviction court applied an incorrect standard of proof to the prejudice prong of the Strickland test, requiring him to show clear and convincing evidence, rather than a reasonable probability, that counsel's failure to assist with his trial testimony affected the outcome of his trial.

## A. Post-Conviction Standard of Review

The petitioner bears the burden of proving the allegations contained in his post-conviction petition by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f) (2003). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999); Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996). However, review of the post-conviction court's application of the law to the facts of the case is *de novo*, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed *de novo*, with a presumption of correctness given only to the post-conviction court's findings of fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001); Burns, 6 S.W.3d at 461.

To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel"guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687, 104 S. Ct. at 2064.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688, 104 S. Ct. at 2065; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). Furthermore, the reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, see Strickland, 466 U.S. at 690, 104 S. Ct. at 2066, and may

not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. See Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). The prejudice prong of the test is satisfied by showing a reasonable probability, i.e., a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694, 104 S. Ct. at 2068.

### B.  Failure to Assist Petitioner's Testimony

The petitioner first indicated his desire to testify after both the State and the defense had rested and counsel were discussing jury instructions with the court.  Trial counsel, who was obviously caught off-guard, advised the petitioner that there was "no way in the world [he could] argue around [the petitioner's] past record," and the trial court, additionally, warned the petitioner that the State could introduce his criminal record if he testified.  When the petitioner continued to express his desire to take the stand, the trial court ordered a recess for counsel to discuss the issue with him further.  At its conclusion, trial counsel informed the court that the petitioner remained adamant about testifying:

> THE COURT:  You all need some more time?
>
> [TRIAL COUNSEL]: No, your Honor.  My client insists on testifying.  I have advised him that if he does, he is on his own.  I am not going to assist him in his testimony because I think the case has already been devastating enough, in my opinion, and this is going to make it even worse.  He's been advised, and we voir dired him, that these prior convictions of his can be used to impeach his credibility.  The jury finds out that he has convictions for violent crimes, it is going to erase any doubt they may have in this case.  So with that, having advised him that he shouldn't do it, and against my advice, I am not going to assist him if he insists on testifying.
>
> THE COURT:  All right.  Well, of course, we don't know what a jury is going to do.  But it is your advice then that you're still advising him not to testify?
>
> [TRIAL COUNSEL]:  Yes, sir.  I have so advised him.
>
> . . . .
>
> THE COURT:  Well, this certainly does put the Court in a dilemma. Let me ask you -- stand up again, please, sir.  Do you understand the jeopardy that you are putting yourself in by taking the stand?  Your lawyer has advised you not to take the stand, and you went through

this one other time and said you didn't want to take the stand. And now you've changed your mind and say you do want to take the stand. And you are aware that several, if not all, of these prior convictions will be read into the record and could be detrimental to you even though the Court will charge and tell the jury that they should not consider them for any purpose whatsoever as far as a guilt or innocence is concerned. Have you understood what I just said?

THE [PETITIONER]: Yes, sir.

THE COURT: And do you still want to take the stand, do you?

THE [PETITIONER]: Yes, sir.

Thereafter, the petitioner took the stand, informed the jury he had a record, and began to recite the details of his second degree murder conviction, stating it occurred when he was a juvenile and in the company of another man who committed the crime. In the midst of his recital, the following transpired:

[PROSECUTOR]: Objection, your Honor. I would object to the statement being given. I would ask that this be in question and answer form.

THE COURT: All right, sir, that is sustained. You'll have to go ahead and give a statement, please, sir, and not ramble. Do you want to try and examine him, [trial counsel]?

[TRIAL COUNSEL]: Can we approach?

THE COURT: Yes, sir.

At the bench hearing, trial counsel explained his reasons for not participating in the petitioner's testimony by questioning him:

[TRIAL COUNSEL]: I don't have any idea what is he [sic] going to say. I mean, I know what to ask him. And, again, it is totally contrary to my advice for him to even be sitting there. And I just don't feel that I can assist him.
I mean, if he wants to make a statement, if he says something that is objectionable, [the prosecutor] is going to object and the jury can be instructed to disregard it.

-11-

THE COURT: That is going to be difficult to get him into a question and answer. He doesn't know how to do that.

[TRIAL COUNSEL]: I just can't help him. I'm not going to help him.

The petitioner contends counsel's refusal to participate in his testimony constituted a deficiency in representation which prejudiced the outcome of his case. Specifically, he argues that, because he "was not prepared for and aided in his presentation of proof, he went into several areas that were not relevant to the case, and actually prejudicial to the defense theory." As an example, he cites his testimony about "several old convictions," which he asserts would not have been admissible to impeach his testimony. With respect to this claim, the post-conviction court concluded as follows:

> Trial counsel's failure to assist the Petitioner during testimony does [not] fall to the level of ineffective assistance of counsel. Under the circumstances, it was unreasonable for counsel not to assist his client's decision, albeit late and unforeseen, to testify. However deficient trial counsel's performance was, it did not however, prejudice the Petitioner's case. According to the transcripts, the Petitioner did not prove beyond clear and convincing evidence that [trial counsel's] performance denied the [petitioner] a fair trial.

> Furthermore, the Petitioner was allowed to testify more, without the help of [trial counsel], than if [trial counsel] would have assisted him. The Petitioner had his chance to tell the jury his side of the story, yet the jury still found him guilty. It was the [petitioner's] decision to testify and he was allowed to do so. Petitioner has failed to prove both prongs of Strickland.

Initially, we disagree with the petitioner's claim that the post-conviction court applied an incorrect standard of proof in utilizing the prejudice prong of the Strickland test. Despite the language the court used in the portion of its order quoted above, elsewhere in the order it correctly stated that the post-conviction petitioner bears the burden of proving "the *allegations of fact* in his petition by clear and convincing evidence" (emphasis added). Furthermore, it correctly stated that a petitioner who alleges ineffective assistance of counsel bears the burden of showing that counsel's performance fell below an objective standard of reasonableness and that "there is *a reasonable probability* that, but for counsel's unprofessional errors, the result of the proceeding would have been different" (emphasis added and internal quotations omitted).

The petitioner's direct testimony covers more than twenty-three pages of the trial transcript and was little encumbered by the laws of evidence. During his testimony, the petitioner vehemently denied his involvement in the crime, explained his whereabouts and actions on the night in question,

and offered his version of the facts underlying his prior convictions for second degree murder and possession of cocaine with the intent to sell. Although he asserts on appeal that the prior convictions he brought up would not have been admissible to impeach his credibility, the record clearly reflects that the trial court had ruled the murder and drug convictions admissible for impeachment purposes and that the petitioner was aware of that fact before he began his testimony. Therefore, trial counsel's assistance with the testimony would not have prevented the damaging information about the prior convictions from reaching the jury. Moreover, the State had a compelling case even without evidence of the prior convictions, presenting proof that the petitioner was arrested in the area shortly after the report of the crimes, essentially matched the descriptions of the attacker, and was identified by each victim as her assailant.

Additionally, by the timing of his demand to testify, the petitioner put trial counsel in an untenable position. Because of the petitioner's previous and continuing decision not to testify, counsel had not prepared him for direct or cross-examination. The nature of the charges and proof against the petitioner would have required counsel to spend a substantial amount of time preparing the petitioner's testimony. It is clear from his unaided trial testimony that the petitioner had a lot he wanted to say and would have been difficult to restrain. Given all of this, and the fact the jury was expecting to hear final arguments after the recess rather than taking a very lengthy recess followed by the petitioner's testimony, we conclude that the petitioner's surprise eleventh hour demand to testify simply was unreasonable.

Under these circumstances, we have no hesitation in concluding that the petitioner has failed to show a reasonable probability that counsel's failure to direct his testimony affected the outcome of his trial.

Because a failure to establish either prong of the Strickland test results in a failure to establish the claim, we need not consider whether counsel was deficient for failing to direct the petitioner's testimony. However, without making a determination on this issue, we note that counsel was an experienced defense attorney who, as is very clear from the record, was well prepared for trial. We note, further, that counsel provided a consistent explanation for his decision not to assist the petitioner at trial and at the evidentiary hearing, stating that he had no idea what the petitioner was going to say and believed asking questions would not have helped and might have compounded the damage caused by the testimony. It is hard to view counsel's failure to rehearse the testimony or prepare a list of questions as unreasonable, given the petitioner's continual expression of his intent not to testify. Although counsel simply might have gone to such fallback questions for the petitioner as "What happened next?", we cannot conclude that this procedure would have resulted in a different verdict.

**B. Failure to Prepare for Trial**

The petitioner next contends that trial counsel failed to familiarize himself with the preliminary hearing testimony, which rendered him unprepared to adequately impeach the victims' trial testimony. He further contends that trial counsel committed several other errors, including his

failure to introduce the fingerprint or dispatch evidence and to point out discrepancies between the descriptions of the attacker and his appearance at the time of his arrest, which cumulatively amounted to ineffective assistance of counsel.

The petitioner bases his assertion that counsel was unfamiliar with the preliminary hearing transcript on the following exchange that occurred during the petitioner's cross-examination testimony:

> Q. And you think the two victims in the courtroom are involved in this racially motivated conspiracy?
>
> A. Yes, sir. I have right here in this preliminary hearing –
>
> [TRIAL COUNSEL]: I haven't even looked at that.
>
> A. -- my preliminary hearing transcript from the lady –
>
> [PROSECUTOR]: Objection. I would - - this is hearsay. I object to it.
>
> THE COURT: That is sustained. You can't mention that, sir, what happened.

However, at the evidentiary hearing, trial counsel expressed his confidence that he had, in fact, reviewed the preliminary hearing transcript and testified he did not know what he had meant by the above statement. The post-conviction court accredited trial counsel's testimony on this issue, finding that counsel was fully prepared and that his decisions with respect to the dispatch transcript and fingerprint evidence were based on sound trial strategy. The record does not preponderate against the post-conviction court's findings. Accordingly, we conclude that the petitioner is not entitled to post-conviction relief based on his claim of ineffective assistance of counsel.

## II. Denial of Petitioner's Request to Proceed *Pro Se*

The petitioner contends the post-conviction court violated his Sixth Amendment right to self-representation, thereby committing reversible error, by denying his repeated requests to represent himself at the post-conviction proceedings. We respectfully disagree.

The constitutional right to self-representation, afforded by both the Sixth Amendment of the United States Constitution and Article I, section 9 of the Tennessee Constitution, is not applicable to post-conviction proceedings. Cole v. State, 798 S.W.2d 261, 263 (Tenn. Crim. App. 1990). However, a post-conviction petitioner has a common law right to self-representation, implicitly established by Tennessee Supreme Court Rule 13. Id. This common law right is not fundamental, and a post-conviction court may therefore appoint counsel to represent a petitioner if necessary for

the proper administration of justice. Charles William Young v. State, No. M2002-01815-CCA-R3-PC, 2004 WL 305790, at \*4 (Tenn. Crim. App. Feb. 18, 2004) (citations omitted).

The record reveals that the petitioner initially sought substitution of counsel rather than the right to proceed *pro se*, stating at an August 15, 2002, hearing that his appointed counsel was not including all the claims he wanted raised and that he therefore wanted "someone who [was] more concerned about [his] situation." The post-conviction court denied the petitioner's request for substitute counsel but granted his subsequent request to represent himself. However, on August 26, 2002, the post-conviction court reversed itself, explaining to the petitioner that it was going to require post-conviction counsel to continue to represent him but would also allow the petitioner to present the claims he wanted raised. The petitioner protested and, in so doing, revealed that his real desire continued to be for the substitution of counsel and/or a delay in the proceedings, rather than the right to self-representation:

> [THE PETITIONER]: But I can't do it -- I can't represent myself. I mean, I don't want this -- I don't trust, first of all, [trial court], and –
>
> THE COURT: You'll have the opportunity to present whatever other issues you have. [Post-conviction counsel] I'm sure will cover that procedure with you.
>
> [THE PETITIONER]: And his amended petition is incomplete.
>
> THE COURT: As I said, you will have the right to present any other issues that you -- that are relevant to this matter. And [post-conviction counsel] will cover the procedure for doing so with you, but we will proceed on the date that I've given. You will have from now -- if there are any additional things you want to bring with you, you have from now until the date that we've given to have those matters here and we'll proceed.

At the evidentiary hearing, the post-conviction court allowed the petitioner to raise the claims his counsel had deemed to be without merit, to make his own assertions and argument, and, with the exception of the victim, to call the witnesses he asserted were essential to prove his allegations. Thus, we agree with the State that there were no claims or evidence that the petitioner was prevented from raising by the post-conviction court's denial of his requests to represent himself. We, therefore, conclude that this issue is without merit.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the denial of the petition for post-conviction relief.

_____
ALAN E. GLENN, JUDGE